719 F.2d 407
 231 U.S.App.D.C. 163
 BLACK CITIZENS FOR A FAIR MEDIA, et al., Petitioners,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
American Broadcasting Companies, Inc., National Association
of Broadcasters, National Radio Broadcasters Association,
Office of Communication of the United Church of Christ, CBS,
Inc., Argonaut Broadcasting Company, et al., Intervenors.
Henry GELLER, Petitioner,
v.
FEDERAL COMMUNICATIONS COMMISSION and United States of
America, Respondents,
National Association of Broadcasters, Intervenor.
 Nos. 81-1710, 81-2277.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 24, 1982.
Decided Oct. 7, 1983.
 
 Petitions for Review of an Order of the Federal Communications commission.
 Jeffrey H. Olson, Washington, D.C., with whom Karen Peltz Strauss, Washington, D.C., was on the brief, for petitioners in 81-1710.
 Henry Geller, Washington, D.C. and Ira Barron were on the brief, for petitioner in 81-2277.
 
 
 1
 Gregory M. Christopher, Counsel, F.C.C., Washington, D.C., with whom Stephen A. Sharp, Gen. Counsel, Daniel M. Armstrong, Associate Gen. Counsel, F.C.C., Barry Grossman and Stephen F. Ross, Attys., Dept. of Justice, Washington, D.C., were on the brief, for respondents. Marion L. Jetton and Margaret G. Halpern, Attys., Dept. of Justice, Washington, D.C., also entered appearances for respondent, USA.
 
 
 2
 Stephen A. Weiswasser, Washington, D.C., with whom J. Roger Wollenberg and Susan Low Bloch for CBS, Inc., and James A. McKenna, Jr., Carl R. Ramey and Douglas S. Land for ABC, Inc., et al., and Erwin G. Krasnow and Barry D. Umansky, Washington, D.C., for National Association of Broadcasters and Thomas Schattenfield, Washington, D.C., for National Radio Broadcasters Association, were on the brief, for intervenors, CBS, Inc., et al., in 81-1710 and 81-2277.
 
 
 3
 Donna A. Demac, New York City, was on the statement in lieu of brief for intervenor, Office of Communication of the United Church of Christ in 81-1710.
 
 
 4
 Robert H. Bohn, Jr., and Honora Kaplan, Boston, Mass., were on the brief, for amicus curiae, Action for Children's Television urging remand in 81-1710.
 
 
 5
 Before WRIGHT and BORK, Circuit Judges, and JAMESON,* Senior District Judge for the District of Montana.
 
 
 6
 Opinion for the Court filed by Circuit Judge BORK.
 
 
 7
 Dissenting opinion filed by Circuit Judge WRIGHT.
 
 BORK, Circuit Judge:
 
 8
 Petitioners, Black Citizens for a Fair Media, et al.,[1] challenge the Federal Communications Commission's decision to adopt a simplified renewal application for radio and television broadcast licensees. This decision, made after a full rulemaking procedure, effectively eliminates from the license renewal application certain information which the Commission had previously required licensees to submit. Petitioners claim that this action is contrary to the substantive requirements of the Communications Act and that, in making the decision, the FCC failed to comply with the reasoned decision-making requirements of the Administrative Procedure Act and the Communications Act. We hold to the contrary and affirm the action of the Commission.
 
 I.
 
 9
 This case is a companion to Office of Communication of the United Church of Christ v. FCC, 707 F.2d 1413 (D.C.Cir.1983), and National Black Media Coalition v. FCC, 706 F.2d 1224 (D.C.Cir.1983). All three cases involve challenges to the effort of the Federal Communications Commission ("FCC" or "Commission") to reduce the regulatory burden on television and radio licensees.
 
 
 10
 In July 1980, the Commission filed a Notice of Proposed Rulemaking "to determine whether the public interest would be served by a revamping of [the] broadcast renewal application procedures." Revision of Applications for Renewal of License of Commercial and Noncommercial AM, FM, and Television Licensees, FCC No. 80-327 (July 11, 1980), at 1 ("Notice ").[2] This Notice, which resulted in the decision now being challenged, proposed a new procedure for renewing broadcast licenses. In the past, licensees were required to file extensive applications[3] containing, for example, such information as proposed non-entertainment and children's programming, the number of public service announcements which were broadcast, and the degree of compliance with FCC requirements for ascertainment of community needs and interests.
 
 
 11
 After reviewing the mechanics of this system, the FCC stated that its experience
 
 
 12
 has shown that most licensees meet or exceed our operating guidelines .... [W]e have found that the best vehicle for bringing violations to our attention has been public participation in our processes through petitions to deny, informal objections, and complaints.
 
 
 13
 Notice at 2. The FCC concluded that the application might place an unnecessary administrative and paperwork burden on both licensees and the Commission.
 
 
 14
 The Notice therefore proposed a new application system that would consist of five different review components. First, all licensees applying for renewal would submit a postcard-sized simplified renewal application containing answers to five questions.[4]
 
 
 15
 The second component is a long form audit--essentially the old renewal form--which would be sent to at least 5% of all television and non-commercial radio stations. (The FCC represents that, in fact, it has been selecting 10% of the eligible licensees for the long-form audit since the new procedures went into effect. Brief for FCC at 9 n. 3.) Third, the FCC would continue to require licensees to make publicly available information as to how the licensees ascertained the problems and needs of their communities and the manner in which the licensee's programming addressed these problems and needs. Television stations would also have to include programming logs and programming "promises" in their public files.[5] The FCC stated its belief that this public file would make sufficient information available to permit the public to test any concerns regarding a licensee's fulfillment of the public service requirement[6]--an important consideration given the Commission's reliance on public participation to bring violations to the Commission's attention.
 
 
 16
 Fourth, the FCC's Field Operations Bureau would conduct random audits of licensees to inspect technical operations and to insure that all required information was being made available to the public. Fifth, the Broadcast Bureau would conduct on-site inspections into charges of licensee misconduct. The Bureau would also have the power to conduct audits of licensees who submit problem applications. Other licensees might be audited on a random basis.
 
 
 17
 On May 11, 1981, after receiving numerous comments from various broadcast groups and "public interest" media groups, the FCC issued its report and order substantially adopting the proposals as put forward in the Notice. Radio Broadcast Services: Revision of Applications for Renewal of License of Commercial and Noncommercial AM, FM, and Television Licensees, 49 Rad.Reg.2d (P & F) 740 (1981) ("Decision "). In promulgating the new system, the FCC stressed that the rulemaking "proceeding was never intended to change our current substantive requirements for the broadcast industry, and it does not alter the substance of licensee obligations to serve the public interest." Id. at 748. Reconsideration of this decision was then sought by petitioner Henry Geller, but was denied. Revision of Applications for Renewal of License of Commercial and Noncommercial AM, FM, and Television Licensees, 87 F.C.C.2d 1127 (1981) ("Reconsideration Decision"). Petitioners now appeal to this court.
 
 II.
 
 18
 Petitioners challenge the FCC's adoption of the new license renewal system on two grounds. First, they contend that the FCC's action violates the mandate of the Communications Act which requires the Commission to find that "the public interest, convenience, and necessity would be served" by a renewal of a broadcast license. 47 U.S.C. Sec. 307(d) (1976), as amended by the Communications Amendments Act of 1982, Pub.L. No. 97-259, Sec. 112, 96 Stat. 1087, 1093 (to be codified at 47 U.S.C. Sec. 307(c)). Petitioners say the FCC is unable to make that affirmative determination without the inclusion of program-related questions in the renewal form. Second, petitioners argue that even if the FCC has the discretion to alter the renewal procedures in the proposed manner, the Commission failed to comply with the reasoned decision-making requirements of the Communications Act and Administrative Procedure Act. We address these points in order.
 
 A.
 
 19
 In determining the mandate of the Communications Act, 47 U.S.C. Sec. 151 et seq. (1976 & Supp. V 1981), this court must focus on the language of the Act itself, with due deference to the Commission's interpretation of its own organic law. Subject to the review we discuss below, the FCC is entitled to reconsider and revise its views as to the public interest and the means needed to protect that interest, though it must give a sufficient explanation of that change. See Central Florida Enterprises, Inc. v. FCC, 598 F.2d 37, 49 (D.C.Cir.1978). The language of the Act imposes few specific requirements and the FCC is generally given broad discretion. The public-interest standard is "a supple instrument for the exercise of discretion by the expert body which Congress has charged to carry out its legislative policy." FCC v. Pottsville Broadcasting Co., 309 U.S. 134, 138, 60 S.Ct. 437, 439, 84 L.Ed. 656 (1940). For that reason, petitioners' reliance on past FCC statements of its mandate is misplaced.
 
 
 20
 The key section which petitioners invoke in support of their argument is section 307(c)[7] which provides in part:
 
 
 21
 Upon the expiration of any license, upon application therefor, a renewal of such license may be granted from time to time for a term of not to exceed five years in the case of television broadcasting licenses, for a term of not to exceed seven years in the case of radio broadcasting station licenses, and for a term of not to exceed ten years in the case of other licenses, if the Commission finds that public interest, convenience, and necessity would be served thereby.
 
 
 22
 47 U.S.C. Sec. 307(d) (1976), as amended by the Communications Amendments Act of 1982, Pub.L. No. 97-259, Sec. 112, 96 Stat. 1087, 1093 (to be codified at 47 U.S.C. Sec. 307(c)). Petitioners also refer to section 309(a) which requires the Commission to determine for each application filed with it whether the public interest, convenience and necessity will be served by the granting of such application. 47 U.S.C. Sec. 309(a) (1976).
 
 
 23
 Petitioners then argue that, although the "public interest, convenience and necessity" is not defined in the statute, the term "public interest"
 
 
 24
 has historically been defined in terms of nonentertainment programming .... [A] licensee's past nonentertainment programming performance is the essential criterion upon which the affirmative public interest determination must be made at renewal time.
 
 
 25
 Brief for Petitioners Black Citizens for a Fair Media, et al. ("BCFM") at 22-23. In sum, petitioners' position is that the simplified renewal application violates the FCC's statutory mandate because it eliminates all questions concerning nonentertainment programming.[8]
 
 
 26
 The Commission does not dispute that it is required affirmatively to find that a license renewal is in the public interest, and it agrees that "[a] broadcaster seeking renewal must run on his record, and the focus of that record is whether his programming has served the public interest." Brief for FCC at 14; see Office of Communication of the United Church of Christ v. FCC, 359 F.2d 994, 1007 (D.C.Cir.1966) (United Church I ). All that is in dispute is whether the FCC is required to include programming-related questions in its renewal application.
 
 
 27
 An examination of the statute and case law clearly shows that such questions are not statutorily required and that the FCC has the discretion to determine whether to include them. First, it is obvious from reading the relevant statutory sections--sections 307(c), 308(b), and 309(a) of Title 47--that Congress did not prescribe specific inquiry into programming. Indeed section 308(b) explicitly addresses the issue of applications and lists certain subjects about which the Commission may inquire.[9] While the enumerated factors are not exclusive, it is significant that programming questions are not included. Moreover, since one would expect some degree of symmetry between the Commission's discretion on applications and that on renewals, it is significant that this circuit has held in regard to application form questions that
 
 
 28
 [Section 308(b) ] leaves it within the discretion of the Commission to decide which facts relating to such factors it wishes to have set forth in applications.
 
 
 29
 National Association of Regulatory Utility Commissioners v. FCC, 525 F.2d 630, 645 (D.C.Cir.), cert. denied, 425 U.S. 992, 96 S.Ct. 2203, 48 L.Ed.2d 816 (1976). Petitioners contend, in effect, that an empowering statute that explicitly grants the Commission broad authority must be read implicitly to impose a highly specific duty. Without more, this is a dubious proposition.
 
 
 30
 A review of the legislative history of the Communications Act and past actions of the FCC reinforces our reading of the statutory text. Prior to 1952, the Communications Act limited the FCC's discretion to grant renewal by requiring the FCC to employ the same practices and considerations it would employ if it were granting an initial license. In 1952, however, Congress eliminated this requirement and inserted the more general "public interest, convenience, and necessity" standard. Communications Act Amendments, 1952, ch. 879, Sec. 6(a), 66 Stat. 711, 714-715. The House Report clearly shows that Congress wanted to reduce the regulatory burden on licensees and grant the FCC discretion to tailor the renewal form as it saw fit. See H.R.Rep. No. 1750, 82d Cong., 2d Sess., reprinted in 1952 U.S.Code Cong. & Ad.News 2234.[10]
 
 
 31
 In the past, the Commission has frequently added and subtracted questions as it deemed appropriate. For example, it was not until the 1960's and 1970's that questions concerning ascertainment of community needs and children's programming were added to the form.[11] Certainly, if the FCC can add specific questions, it can delete them when circumstances warrant.
 
 
 32
 Moreover, the Commission frequently decides to monitor and enforce certain aspects of a licensee's performance--e.g., compliance with the fairness doctrine--on an ad hoc basis rather than at the time for license renewal. See National Citizens Committee for Broadcasting v. FCC, 567 F.2d 1095, 1115-16 (D.C.Cir.1977), cert. denied, 436 U.S. 926, 98 S.Ct. 2820, 56 L.Ed.2d 769 (1978) (Communications Act does not require FCC to review fairness doctrine compliance at renewal time; decision to review on ad hoc basis is reasonable exercise of discretion). Thus, the legislative history of the Communications Act and past FCC actions make clear that the FCC is in no way required to retain certain questions, whether program-related or not, in the renewal application.[12]
 
 
 33
 Finally, case law strongly supports the broad exercise of FCC discretion both to define the public interest and to determine what procedures best assure protection of that interest. As the Supreme Court has pointed out:
 
 
 34
 Necessarily, therefore, the subordinate questions of procedure in ascertaining the public interest, when the Commission's licensing authority is invoked ... were explicitly and by implication left to the Commission's own devising, so long, of course, as it observes the basic requirements designed for the protection of private as well as public interest.
 
 
 35
 FCC v. Pottsville Broadcasting Co., 309 U.S. at 138, 60 S.Ct. at 439. Moreover, the Supreme Court recently found that this discretion is particularly broad in the area of programming. In FCC v. WNCN Listeners Guild, 450 U.S. 582, 101 S.Ct. 1266, 67 L.Ed.2d 521 (1981), the Court upheld a decision by the FCC not to review entertainment format changes in the context of a license renewal application, noting that "the Commission's judgment regarding how the public interest is best served is entitled to substantial judicial deference." Id. at 596, 101 S.Ct. at 1275. See also National Tour Brokers Association v. ICC, 671 F.2d 528, 531-32 (D.C.Cir.1982) (upholding revised ICC licensing procedure involving "public interest" determination; prior ICC interpretation of statute does not forever bind agency).[13] There can be little question that the FCC is free under the Communications Act to alter the license renewal application as it sees fit--provided that the Commission still has sufficient information to make the required "public interest" determination.
 
 
 36
 This latter issue is the crux of petitioners' complaint. Petitioners contend that even if the FCC has discretion to alter the application, the changes that the Commission has adopted so completely eliminate important information as to make meaningful enforcement of the public interest standard impossible. Although the FCC has deleted from the application many questions which previously supplied substantial information, we believe that it was not arbitrary or capricious for the Commission to conclude, in the exercise of its discretion, that it still has sufficient information to make the "public interest" determination.
 
 
 37
 The Commission does not propose to rely solely on the postcard application to make the "public interest" finding. The postcard renewal form is one of several sources of information (direct and indirect) on the basis of which the Commission will make its renewal decision. This information, taken together, does permit the FCC to make the required determination that a licensee is in compliance with the substantive policies of the Commission--policies that are still concerned with programming and are not affected by the decision in question.[14]
 
 
 38
 A brief review of the renewal system illustrates this point. First, the Commission has the renewal form itself which provides (1) information concerning a licensee's equal opportunity program, (2) a description of a licensee's other media interests, (3) a certification of compliance with the alien ownership requirements of the act, (4) disclosures about a licensee's character, and (5) a certification that the licensee has placed all required documents in its public file.
 
 
 39
 Second, the FCC will have the input of the public. This is in many ways the most critical information, as the Commission has "found that the best vehicle for bringing violations to [its] attention has been public participation in [its] processes through petitions to deny, informal objections, and complaints." Notice at 2. Under the new renewal system public input provides information in two ways. As the Notice pointed out, the public brings violations to the attention of the FCC. Thus, public silence supports an inference that a licensee has been complying with FCC policies.[15] Such an inference is of course not in any way conclusive; but it is a factor which the FCC may weigh in making a "public interest" determination.
 
 
 40
 Petitioners contend that this reliance on the public constitutes an impermissible shift of the FCC's statutory duty onto the public. This argument, however, overstates the FCC's reliance on public participation. Contrary to assertions by petitioners, the new renewal system does not rely entirely on the public. Rather, information provided by the public is but one factor, albeit an important factor, in the overall renewal scheme. Moreover, the degree of reliance is not unreasonable because, as the Commission notes, the public is quite aware of licensees' programming. Brief for FCC at 22. Such reliance on the public is especially warranted in an era of limited resources when the FCC must allocate its budget over a wide range of regulated activities. Cf. United Church I, 359 F.2d at 1004-05 (recognizing importance of public participation in renewal process, given limited staff and resources). The public's responsibility in the prior system was also substantial. Indeed, it was the FCC's recognition of the importance of the public's role that led, in part, to the promulgation of the new system.
 
 
 41
 Finally, petitioners argue that, even if the FCC's reliance on the public is permissible, the Commission has made it impossible for the public to play an active role in the renewal procedure. In this regard, petitioners point to FCC actions which petitioners claim have severely limited the information licensees must provide to the public.[16] In order to determine the validity of this claim, we examine separately the public file requirements of television and radio licensees.[17]
 
 
 42
 Television licensees must place a substantial amount of information in their public file. For example, a licensee must include documentation concerning ascertainment of community problems as well as an annual list of no more than ten significant problems or needs of the community served, along with examples of programs which meet these problems or needs. 47 C.F.R. Sec. 73.3526(a)(9) (1982). In addition, television licensees must maintain program logs for the composite week and keep on file current "promises" concerning presentation of nonentertainment programming; if a licensee changes its general plans for such programming, it must then file an update noting the changes and the new programming promises.[18] Id. Sec. 73.3526(a)(8). Finally, television licensees must also maintain raw program logs (a written record of everything a licensee broadcasts), id. Sec. 73.3526(a)(10), and make these logs available for public inspection in accordance with certain procedures, 47 C.F.R. Sec. 73.1850 (1982).[19] This information is sufficient to permit the public to review a station's programming performance.[20]
 
 
 43
 In contrast, radio licensees need file only an annual issues/programs list[21] and an explanation of the methodology used to compile the list.[22] Petitioners argue that this list is too insubstantial to permit meaningful review by the public of a station's programming and urge the inclusion of program logs. In a companion case dealing with the FCC's general deregulation of radio, we remanded the Commission's decision to do away with the logging requirement. Office of Communication of the United Church of Christ v. FCC, 707 F.2d 1413 (D.C.Cir.1983) (United Church III ). On remand, the Commission will decide what logging requirement, if any, is appropriate in the deregulated environment. Given the Commission's wide latitude in the practical implementation of Congress' will, we do not find that the renewal procedure mechanism adds any new factors to the calculus already required by United Church III. The new renewal procedure will function acceptably given whatever logging requirement the Commission (subject to judicial review) eventually adopts in response to our remand. Accordingly, we neither invalidate the new renewal system on this basis nor provide any additional condition that any logging requirement must meet.
 
 
 44
 Finally, the Commission has before it a presumption of service in the public interest. Decision at 748. Petitioners attack this presumption as being contrary to section 309(c) of the Communications Act and such cases as United Church I, 359 F.2d at 1008, and Office of Communication of the United Church of Christ v. FCC, 425 F.2d 543, 545 (D.C.Cir.1969) (United Church II ), which hold that a licensee must affirmatively demonstrate that renewal will serve the public interest. This attack is misplaced. Neither the statute nor the legislative history precludes the Commission from inferring service in the public interest by existing licensees, given that the inference is rebuttable and the regulatory environment provides strong incentives for operation in the public interest.[23]
 
 
 45
 Those incentives are generated largely by the tools which the Commission uses to discover and punish violators. Investigation of citizen complaints is one important tool. In addition, the long form audit and onsite inspections by the Field Operations Bureau and Broadcast Bureau are designed not only to provide the Commission with concrete information on the specific licensees audited but also to deter licensees from noncompliance with the substantive requirements. The Commission can also prevent potential violations by punishing those discovered with fines and license revocations. The severity of such sanctions, see, e.g., WADECO, Inc. v. FCC, 628 F.2d 122 (D.C.Cir.1980), and the willingness of the FCC to impose them make more reliable a presumption that a licensee will adhere to the substantive requirements of the Commission and the Act.
 
 
 46
 Petitioners respond to this contention by arguing that only a small percentage of licensees are subject to the random audit and spot checks and that consequently the deterrent effect of such devices is minimal. All licensees will be affected by the knowledge some unknown number will be examined and, if appropriate, visited with severe sanctions. Moreover, the determination concerning degrees of deterrence is precisely the type of judgment which is best left to the Commission. Nor is the fact that the FCC may not be able to identify all noncomplying licensees a reason to overturn the decision. No regulatory scheme which depends in part on the good faith of the licensee will be utterly fool-proof; the previous system certainly was not. Both approaches ultimately rely on presumptions and on the good faith of the licensees.
 
 
 47
 The simplified renewal application also offers concrete benefits in the form of reduced paperwork and expense. While these factors are not, of course, grounds for ignoring a statutory mandate, they are an advantage the Commission is entitled to weigh in making its decision. The Federal Paperwork Reduction Act of 1980, Pub.L. No. 96-511, 94 Stat. 2812 (codified at 44 U.S.C. Secs. 3501-3520 (Supp. V 1981)), was enacted "to minimize the federal paperwork burden," 44 U.S.C. Sec. 3501(1) (Supp. V 1981). This is to be accomplished by eliminating regulatory burdens "which are found to be unnecessary and thus wasteful ...." S.Rep. No. 930, 96th Cong., 2d Sess. 3, reprinted in 1980 U.S.Code Cong. & Ad.News 6241, 6243. Congress specifically applied this policy to the FCC's domain when it extended the broadcast license term to five years for television stations and seven years for radio. Omnibus Budget Reconciliation Act of 1981, Pub.L. No. 97-35, Sec. 1241, 95 Stat. 357, 736.[24] Thus, the reduction in regulatory burden which the FCC has effected is not just a result of FCC impulse, but rather stems directly from the Paperwork Reduction Act and congressional policy with respect to the FCC. There can be little doubt that this mandate provides further support for the FCC's decision.
 
 
 48
 We conclude that the new license renewal system is adequate to permit the Commission to make the determination that a license renewal is in the public interest.
 
 B.
 
 49
 Petitioners' second major argument is that even if the FCC has the statutory discretion to adopt the simplified renewal application, the Commission has nevertheless failed to comply with reasoned decision-making requirements of the Communications Act and the Administrative Procedure Act. The Commission's decision, however, readily survives the "searching and careful" review to which we subject it. See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971).
 
 
 50
 Here, our review must include an additional special factor: the FCC's adoption of the simplified renewal application represents a significant change in policy. The court must, therefore, be satisfied that the agency was aware that it was changing its views and has articulated permissible reasons for the change. See Greater Boston Television Corp. v. FCC, 444 F.2d 841, 852 (D.C.Cir.1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2233, 29 L.Ed.2d 701 (1971).[25]
 
 
 51
 This is not a case where an agency altered course without acknowledging or recognizing the change. The first paragraph of the Notice states that the proceeding was being initiated to determine whether the FCC should "revamp" its renewal procedures. Notice at 1.
 
 
 52
 Nor is this a case where the agency has failed to provide a reasoned explanation for its change in policy. Here the Commission clearly set out its rationale; namely, that the same degree of compliance could be achieved with the simplified renewal application. While this finding is not in itself rigorously deduced, it is well established that greater deference is given administrative bodies when their decisions are based upon "judgmental or predictive" conclusions. FCC v. National Citizens Committee for Broadcasting, 436 U.S. 775, 813-14, 98 S.Ct. 2096, 2121-22, 56 L.Ed.2d 697 (1978). Accord FCC v. WNCN Listeners Guild, 450 U.S. at 595-96, 101 S.Ct. at 1274-75. The FCC also clearly stated that adoption of the simplified renewal application would in turn "free up scarce resources for use in other areas." Decision at 747. This finding was factually supported in the record by, for example, estimates of the funds that would be saved by adoption of the new form. E.g., Decision at 754.
 
 
 53
 Petitioners specifically attack two aspects of the Decision. Petitioners assert that the basis of the FCC's decision was the conclusion that past experience indicated most licensees comply with the substantive regulations.[26] They then contend that this conclusion does not warrant altering the procedures and, if anything, supports retaining the old system.[27] This argument, however, distorts the Commission's position. The Commission discarded the old system for the new not because the old system worked, but rather because it believed the new system would work just as well:
 
 
 54
 We believe that we can discharge our obligations by adopting a simplified renewal application (SRA)....
 
 
 55
 Decision at 741. In overlooking the Commission's conclusion that the new method could achieve equivalent compliance, petitioners reveal the true nature of their complaint; they believe the old system works better and wish to substitute their judgment for that of the Commission. When seen in that light, petitioners' argument must fail.[28]
 
 
 56
 As we have noted, and as petitioners concede, the Communications Act gives the FCC "substantial discretion to reconsider and review the appropriateness of [its] regulations including the continued need for particular information in connection with renewal applications." Decision at 747; see National Association of Regulatory Utility Commissioners v. FCC, 525 F.2d at 645. Moreover, the FCC has worked with renewal applications for many years and has developed considerable expertise and experience.[29] See West Michigan Telecasters, Inc. v. FCC, 396 F.2d 688, 691 (D.C.Cir.1968) (court "defer[s] to the expertise and experience of the Commission within its field of specialty and would reverse only where the Commission's position is arbitrary, capricious or unreasonable").
 
 
 57
 Petitioners also argue that the FCC cannot dispense with the old system on the basis of a desire to relieve itself and/or licensees from regulatory burdens. Again, however, this argument is premised on petitioners' belief that the new system will not serve the public interest. The FCC has reasonably rejected that premise and we must reject the conclusion. The Commission may consider regulatory burden in choosing between two procedures, each of which serves the public interest. The FCC is, moreover, statutorily authorized to reduce the regulatory burden on licensees and we find this to be additional support for the Commission's action.
 
 
 58
 Accordingly, the orders here under review are
 
 
 59
 Affirmed.
 
 WRIGHT, Circuit Judge, dissenting:
 
 60
 The Federal Communications Commission (the Commission) has in recent years undertaken a substantial deregulation of broadcasting in this country. In two companions to this case, Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413 (D.C.Cir.1983), and Nat'l Black Media Coalition v. FCC, 706 F.2d 1224 (D.C.Cir.1983), this court approved, with some reservations, the bulk of the Commission's deregulatory effort. In the present case petitioners, Black Citizens for a Fair Media et al., have brought a challenge to the Commission's recent deregulatory endeavors in the area of broadcast license renewal. After notice and comment rulemaking, the Commission promulgated in 1981 a rule that dramatically pared down the license renewal procedures for broadcast licensees. In particular, the Commission eliminated its long-standing practice of requiring all renewal applicants to provide the Commission with substantial information about their programming during the prior license term. Petitioners' challenge springs from this decision to eliminate individualized programming inquiries from the renewal process. They assert that this decision contravenes the substantive requirements of the Communications Act, 47 U.S.C. Sec. 151 et seq. (1976 & Supp. V 1981), and is not the product of reasoned decisionmaking as required by Section 10 of the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982). The majority opinion upholds the Commission's decision in the face of these challenges.
 
 
 61
 I dissent. The mandates of the statutory language of the Communications Act, understood in light of the premises and purposes of the regulatory scheme that Congress established in the Act, require the Commission to investigate the programming of each applicant for renewal of a broadcast license. It is a fundamental premise of the Act that the public, and not the broadcaster, owns the airwaves. Under the regulatory scheme, a broadcaster receives free and exclusive use of a slice of this public resource, the remunerative potential of which has proven to be vast. In return, the broadcaster must use this public resource so as to serve the "public interest, convenience, and necessity." 47 U.S.C. Secs. 303, 307, 309, 315. This public interest standard mandates programming that meets the needs of a broadcaster's viewing or listening community. See Part III-A infra. The statute establishes the Commission as the overseer of this relationship between the broadcaster and its viewing or listening public. The Commission exercises this oversight primarily through the renewal process. To fulfill its responsibility the Commission had traditionally required each renewal applicant to provide information sufficient to permit the Commission to determine whether the applicant had met its public interest programming obligations. Only by making such an individualized inquiry into the programming of every renewal applicant can the Commission abide by the statutory mandate that it "shall determine, in the case of each application filed with it * * *, whether the public interest * * * will be served" by renewal. 47 U.S.C. Sec. 309(a) (emphasis added). The Commission's recent decision to forsake programming inquiries amounts to an abdication of its statutory responsibilities, and this court should invalidate the Commission's plan.
 
 I. BACKGROUND
 
 62
 A. The Commission's Traditional Approach to Renewal of Broadcast Licenses
 
 
 63
 Traditionally, programming inquiries have been central to the renewal process under the Communications Act. Sections 307 and 309 of the Act, 47 U.S.C. Secs. 307, 309, direct the Commission to grant license renewals only to applicants who have provided service in the public interest. Until its recent turnabout, the Commission had always thought that this statutory directive mandated an inquiry into programming of every renewal applicant.
 
 
 64
 The Commission first set out this understanding in its "Blue Book" of 1946, REPORT ON PUBLIC SERVICE RESPONSIBILITY OF BROADCAST LICENSEES 11-12 (1946). The Blue Book states that "there can be no doubt that Congress intended the Commission to consider overall program service in processing applications," and that the Commission is "under an affirmative duty, in its public interest determinations, to give full consideration to program service." Id. Fourteen years later the Commission restated its commitment to the necessity of programming inquiries in its Report and Statement of Policy Re: En Banc Programming Inquiry, 44 FCC 2303 (1960) (hereinafter En Banc Programming Inquiry ). This policy statement recognized that the licensee's public interest obligations required it to "render the best practicable service to the community reached by [its] broadcasts," id. at 2311, and that this service encompassed a "diligent * * * effort * * * to discover and fulfill the tastes, needs and desires" of the broadcaster's community. Id. at 2312. The Commission also acknowledged its own duty to "provide reasonable assurance to the public that the broadcast service it receives is such as its direct and justifiable interest requires," id. at 2313, and noted that the "particular manner in which applicants are required to depict their proposed or past broadcast policies and services * * * may * * * have significant bearing upon the Commission's ability to discharge its statutory duties * * *." Id. at 2317. These findings led the Commission to propose that licensees be required to include in renewal applications both the way in which they had ascertained community needs and interests and the nonentertainment programming that they had presented to respond to those needs and interests. Id. at 2316-2317.
 
 
 65
 In 1965 the Commission revised its renewal application for radio stations to implement the findings of the 1960 En Banc Programming Inquiry. See Amendment of Section IV of Broadcast Application Forms 301, 303, 314, and 315, 1 FCC2d 439 (1965) (hereinafter AM-FM Program Form ). And in 1966 the Commission similarly amended its renewal application for television stations. See Amendment of Section IV of Broadcast Application Forms 301, 303, 314, and 315, 5 FCC2d 175 (1966). In both cases the new renewal application required licensees to provide detailed nonentertainment programming information.
 
 
 66
 The Commission again revised its renewal applications in 1973. See Formulation of Rules and Policies Relating to the Renewal of Broadcast Licenses, 43 FCC2d 1 (1973). This revision required television licensees to fill out an annual program form that focused on the licensee's annual nonentertainment programming, and to maintain the form in a file open to public inspection. The 1973 revision also required more detailed information on the renewal applicant's efforts to ascertain community needs, its programming responsive to these needs, its programming directed to those under twelve years of age, and its commercial practices. See Appendix B to brief of petitioners Black Citizens for a Fair Media et al.
 
 
 67
 Two years later the Commission conducted yet another rulemaking to revise its renewal applications. See Revision of FCC Form 303, Application for Renewal of Broadcast Station License, Notice of Inquiry and Proposed Rulemaking, 52 FCC2d 184 (1975). This proceeding led one year later to a revised application that significantly reduced the number of particular areas into which the renewal application inquired. See Revision of FCC Form 303, Application for Renewal of Broadcast Station License, 59 FCC2d 750 (1976) (hereinafter FCC Form 303). The Commission stressed, however, that this simplification of the renewal form was intended only to permit the Commission to focus on program categories "particularly relevant to [its] public interest determination," id. at 769, and that no diminution in the Commission's statutory duty to make a public interest finding for each renewal applicant was implied.[1]
 
 
 68
 Thus, immediately prior to the rulemaking proceedings that resulted in the rule challenged in this case, the Commission's renewal application forms continued to place substantial emphasis on licensee nonentertainment programming.[2]
 
 
 69
 B. Procedural History of the Commission's New Plan
 
 
 70
 On July 11, 1980 the Commission issued a notice of proposed rulemaking to consider possible revision of the license renewal process. Notice, supra note 2, JA 47. In this proposed rulemaking the Commission, bringing its deregulatory credo to bear on the renewal process, sought to reduce the substantial filings that had been required of all renewal applicants. It stated its rationale for this policy:
 
 
 71
 Our experience has shown that most licensees meet or exceed our operating guidelines * * *. Indeed, we have found that the best vehicle for bringing violations to our attention has been public participation in our processes through petitions to deny, informal objections, and complaints. Therefore, it appears that our current approach to renewals may place a largely unnecessary paperwork and administrative burden on the licensees and the Commission. We therefore question the need to continue the in-depth renewal filings * * *. * * *
 
 
 72
 Notice at 2, JA 48.
 
 
 73
 In light of these beliefs, the Commission proposed a dramatic revision in the renewal process. The Commission proposed in particular that the in-depth renewal applications be scrapped and replaced with the following four-part scheme:
 
 
 74
 (1) All licensees would be required to complete a simplified renewal application. This application would be postcard size and would ask four brief questions concerning the applicant's compliance with the alien ownership, equal employment opportunity, good character, and public file requirements of the Act.
 
 
 75
 (2) Long-form audits, which would closely resemble former application forms, would be sent to a random sample of five percent of all licensees. These forms would contain detailed programming inquiries.
 
 
 76
 (3) On-site inspections would be conducted on approximately 16 percent of licensees. Inspections would check compliance with the Act's technical requirements and with public file requirements.
 
 
 77
 (4) Licensees would continue to maintain a public file that contained information regarding the licensee's ascertainment of community needs, its promises of programming to meet those needs, and its programming performance. This public file would facilitate public complaints regarding insufficient licensee programming.
 
 
 78
 See Notice at 3-15, JA 49-61.
 
 
 79
 This scheme embodies a distinct shift away from the individualized review of programming practices that the Commission had for so long thought the Act required. Under the new plan[3] the Commission would rely on a combination of deterrence through the threat of audit or inspection and public vigilance, facilitated by information in the licensees' public files, to ensure that licensees programmed in the public interest. If the Commission were to receive a public complaint, or if the postcard application, long-form audit, or on-site inspection were to turn up evidence of programming inadequacy, the Commission would make an individualized inquiry into the licensee's programming. Otherwise the Commission would presume licensee compliance with programming requirements.
 
 C. The Decision to Adopt the New Plan
 
 80
 After receiving and considering comments from more than 100 parties, the Commission approved the postcard renewal plan in a form essentially identical to that originally proposed. Radio Broadcast Services: Revision of Applications for Renewal of License of Commercial and Noncommercial AM, FM, and Television Licensees, 49 Rad.Reg.2d (P & F) 740 (1981) (hereinafter Decision ), JA 6. The Commission did modify its original proposal in two ways. First, it exempted commercial radio licensees from the group that would be subject to the long-form audit requirement. Decision at 748-749, JA 14-15. This action was taken in coordination with the Commission's decision to effect a substantial deregulation of commercial radio. See Office of Communication of United Church of Christ v. FCC, supra, 707 F.2d 1413. As a result of this decision, approximately 8,100 of the 10,400 holders of broadcast licenses would be exempt from the long-form audit, and this audit would thus fall on only one percent of all broadcast licensees each year. Brief for petitioners at 19. Second, the Commission reduced the percentage of licensees subject to the random on-site inspections from 16 percent to 10 percent annually. Decision at 752, JA 18.
 
 
 81
 Approving this overhaul of the renewal process, the Commission explicitly noted that the new plan "was never intended to change our current substantive requirements for the broadcast industry, and * * * does not alter the substance of licensee obligations to serve the public interest." Id. at 748, JA 14. See id. at 741, JA 7. The Commission also expressed its belief that its "ability to make [the] public interest finding is preserved through the SRA [Simplified Renewal Application]." Id. at 748, JA 14.
 
 
 82
 After the Commission denied a petition to reconsider this decision, Revision of Application for Renewal of License of Commercial and Noncommercial AM, FM, and Television Licensees, 87 FCC2d 1127 (1981),[4] petitioners Black Citizens for a Fair Media et al. brought their challenge to the Commission before this court.
 
 II. STANDARD OF REVIEW
 
 83
 The Communications Act grants to the Commission broad authority to regulate broadcasting so as to serve the "public interest, convenience, and necessity." 47 U.S.C. Sec. 303. Providing little more than this general touchstone for guidance, Congress sought to ensure that the Commission was unfettered in its endeavors to keep astride "a field of enterprise, the dominant characteristic of which was the rapid pace of its unfolding." Nat'l Broadcasting Co. v. United States, 319 U.S. 190, 219, 63 S.Ct. 997, 1011, 87 L.Ed. 1344 (1943). Though the public interest standard is not a roving license to do good, and takes directive meaning from its statutory scheme, see Office of Communication of United Church of Christ v. FCC, supra, 707 F.2d at 1423-1424, the Communications Act should nonetheless be read as delegating to the Commission substantial authority for elaborating the precise meaning of the public interest standard.
 
 
 84
 When this court reviews Commission rules promulgated pursuant to such congressional delegations of power, we do not substitute our judgment for that of the Commission as to whether the rules under review are the best method of serving the public interest. Rather, we review the Commission's action to determine whether the Commission exercised reasoned decisionmaking and whether it exceeded its statutory authority. Herwig v. Ray, 455 U.S. 265, 275, 102 S.Ct. 1059, 1066, 71 L.Ed.2d 137 (1982); Gray Panthers v. Schweiker, 453 U.S. 34, 44, 101 S.Ct. 2633, 2640, 69 L.Ed.2d 460 (1981); Batterton v. Francis, 432 U.S. 416, 426, 97 S.Ct. 2399, 2406, 53 L.Ed.2d 448 (1977).
 
 
 85
 The parameters of reasoned decisionmaking are readily discernible in the case law. The mandate of the Administrative Procedure Act (APA) that a reviewing court set aside agency action found to be "arbitrary, capricious, or an abuse of discretion," 5 U.S.C. Sec. 706(2)(A), requires the court to ensure that the agency's decision "is rational, has support in the record, and is based on a consideration of relevant factors." Telocator Network of America v. FCC, 691 F.2d 525, 537 (D.C.Cir.1982). See Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416, 91 S.Ct. 814, 823, 28 L.Ed.2d 136 (1971); Office of Communication of United Church of Christ v. FCC, supra, 707 F.2d at 1424-1426.
 
 
 86
 APA's requirement that agency action not be "in excess of statutory * * * authority," 5 U.S.C. Sec. 706(2)(C), is more murky in its parameters. Essentially, the reviewing court must ensure that the agency action at issue comports with congressional intent; agency action inconsistent with congressional intent exceeds the limits of an agency's delegated authority. See Planned Parenthood Federation of America v. Heckler, 712 F.2d 650, 655-656 (D.C.Cir.1983); Office of Communication of United Church of Christ v. FCC, supra, 707 F.2d at 1422-1424.
 
 
 87
 That this principle is not altogether clear from the case law is largely the result of the distortive gravitational pulls of two opposing platitudes. Pulling in one direction is the maxim that a reviewing court should defer to an agency's interpretation of its governing statute. See Udall v. Tallman, 380 U.S. 1, 16, 85 S.Ct. 792, 801, 13 L.Ed.2d 616 (1965). Exerting a countervailing pull is the maxim that courts are always the final authorities on issues of statutory construction. See FTC v. Colgate-Palmolive Co., 380 U.S. 374, 385, 85 S.Ct. 1035, 1042, 13 L.Ed.2d 904 (1965). Though both are in a sense correct, neither as formulated is sufficiently sensitive to the salient differences among situations in which a reviewing court must evaluate an agency interpretation of its governing statute. And though both have been at times applied to the process of deciding whether agency action has exceeded statutory authority, neither governs review under this test, as properly understood.
 
 
 88
 In every case in which a court reviews an agency interpretation of its governing statute, the court must decide in the first instance whether the agency or the court should supply the meaning of the statutory term at issue. The intent of Congress governs this decision. Nat'l Wildlife Federation v. Gorsuch, 693 F.2d 156, 167 (D.C.Cir.1982); Process Gas Consumers Group v. U.S. Dep't of Agriculture, 694 F.2d 778, 791 (D.C.Cir.1982) (en banc ). If Congress has delegated to an agency the task of elaborating the meaning of a statutory directive, then a reviewing court must accept the agency interpretation if it is not arbitrary or capricious or in excess of statutory authority. See NLRB v. Hearst Publications, Inc., 322 U.S. 111, 126-127, 64 S.Ct. 851, 858-859, 88 L.Ed. 1170 (1944). It remains for the reviewing court in the first instance to exercise full powers of statutory interpretation to determine whether Congress delegated the norm-elaboration function to the agency, and in this sense the court is the final authority on issues of statutory construction. But once the court has determined that Congress has made such a delegation, the court may not substitute its judgment for that of the agency as to whether the agency's action expresses the "best" understanding of the statutory term.[5]
 
 
 89
 This does not, however, exhaust the court's interpretive responsibility. Even when a court has decided that Congress delegated to the agency the task of supplying the meaning of a statutory term, the court must still ensure that the meaning supplied does not contravene congressional intent. Implicit in every congressional delegation of power to interpret a statutory term is the limit that the agency interpretation be consistent with the congressional purposes expressed in the statutory scheme containing the term at issue. Section 10 of the APA mandates review to police this limit; the court must ensure that agency action is not "in excess of statutory * * * authority." 5 U.S.C. Sec. 706(2)(C). Since every agency rule or decision presumptively carries the implicit message that the agency views it as consistent with congressional intent, the court should not defer to the agency view on this issue. Deference would amount to granting the agency a license to chart the bounds of its own power.[6] Instead the reviewing court must itself evaluate the statute and its legislative history to determine whether the agency action at issue comports with the intent of Congress. Reviewing courts "are not obliged to stand aside and rubber-stamp their affirmance of administrative decisions that they deem inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute. Such review is always properly within the judicial province, and courts would abdicate their responsibility if they did not fully review such administrative decisions." NLRB v. Brown, 380 U.S. 278, 291-292, 85 S.Ct. 980, 988-989, 13 L.Ed.2d 839 (1965) (emphasis added). See Volkswagenwerk Aktiengesellschaft v. FMC, 390 U.S. 261, 272, 88 S.Ct. 929, 935, 19 L.Ed.2d 1090 (1968) (quoting NLRB v. Brown, supra, 380 U.S. at 291, 85 S.Ct. at 988).
 
 
 90
 Recent Supreme Court cases have affirmed this principle in cases involving review of agency rules made pursuant to explicit congressional delegations of power to elaborate the meaning of a statutory term. Applying the "in excess of statutory * * * authority" standard of Section 10 of the APA, the Court in every case measured the agency rule against the Court's interpretation of congressional intent. Herwig v. Ray, supra, 455 U.S. at 275-276, 102 S.Ct. at 1066-1067; Gray Panthers v. Schweiker, supra, 453 U.S. at 44, 45-46, 101 S.Ct. at 2640, 2641-2642; Batterton v. Francis, supra, 432 U.S. at 428, 97 S.Ct. at 2407 (Administrator "could not, for example, pass a regulation that would * * * defeat the purposes of the * * * program"). See also FCC v. WNCN Listeners Guild, 450 U.S. 582, 596, 101 S.Ct. 1266, 1275, 67 L.Ed.2d 521 (1981) ("As we see it, the Commission's Policy Statement is in harmony with" cases defining the purposes of the Communications Act.); Espinoza v. Farah Mfg. Co., 414 U.S. 86, 94-95, 94 S.Ct. 334, 339-340, 38 L.Ed.2d 287 (1973) (application of agency guideline found to be inconsistent with congressional intent); Morton v. Ruiz, 415 U.S. 199, 234-237, 94 S.Ct. 1055, 1074-1075, 39 L.Ed.2d 270 (1974) (agency rule placing geographical limit on eligibility of potential beneficiaries of statute must be consistent with congressional intent); American Ship Building Co. v. NLRB, 380 U.S. 300, 316-317, 85 S.Ct. 955, 966-967, 13 L.Ed.2d 855 (1965) (no fair construction of statute permits agency interpretation of statutory term).
 
 
 91
 Thus, review under the "in excess of statutory * * * authority" standard requires the court neither to defer to the agency interpretation nor to exercise completely independent judgment as to the statutory term at issue. Rather, the court measures the agency's interpretation of the term against the court's interpretation of congressional intent. If the court finds the agency reading consistent with congressional intent, the court's inquiry is over; the court does not determine whether the agency interpretation is the best path to the goals Congress set. If, however, the reviewing court finds that the agency interpretation contravenes a statutory mandate or frustrates congressional purposes underlying a statute, the court is duty bound to invalidate the agency interpretation.
 
 
 92
 In the present case Congress has left to the Commission much of the authority for elaborating the meaning of the public interest standard. Pursuant to this delegated power, the Commission has promulgated the postcard renewal plan that petitioners challenge in this proceeding. On review this court must determine whether the postcard renewal plan is consistent with the statutory mandates and underlying congressional purposes of the Communications Act. If this court finds that the plan contravenes the intent of Congress, we must follow the command of Section 10 of the APA and invalidate the plan because it is "in excess of statutory * * * authority."[7]
 
 III. REVIEW OF THE MERITS
 
 93
 In this case petitioners Black Citizens for a Fair Media et al. make the straightforward claim that the Commission's postcard renewal plan contravenes the intent of the Communications Act because the plan does not require the Commission to ensure that each renewal applicant has met the Act's public interest programming requirements. This court must analyze the statutory mandates and underlying congressional purposes of the Communications Act to determine whether the Act places on the Commission the affirmative duty of examining the programming of every renewal applicant. If the postcard renewal plan is found to frustrate congressional intent, it must fail.
 
 A. The Public Trust Concept
 
 94
 A broadcasting license is a public trust. The licensee obtains "the free and exclusive use of a valuable part of the public domain," and in return assumes a duty to serve the public interest by this use. See Office of Communication of United Church of Christ v. FCC, 359 F.2d 994, 997, 1003 (D.C.Cir.1966) (hereinafter United Church I ). Congressman White, a sponsor of the original Radio Act that became the Communications Act in 1934, articulated this understanding more than half a century ago on the floor of the House of Representatives: "The right of the public to service is superior to the right of any individual * * *. If enacted into law, the broadcasting privilege will not be a right of selfishness. It will rest upon an assurance of public interest to be served." 67 Cong.Rec. 5479 (1926) (remarks of Rep. White). Amending the Communications Act in 1959, Congress reaffirmed that the public trust concept is the animating principle of the Act. The Senate report accompanying the amendment stated: "Broadcast frequencies are limited and, therefore, they have been necessarily considered a public trust. Every licensee who is fortunate in obtaining a license is mandated to operate in the public interest." S.Rep. No. 562, 86th Cong., 1st Sess. 8 (1959), U.S.Code Cong. & Admin.News 1959, 2564, 2571. And the public trust concept has long guided courts interpreting the Act. See Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 375-377, 89 S.Ct. 1794, 1798-1800, 23 L.Ed.2d 371 (1969) (hereinafter Red Lion ); Office of Communication of United Church of Christ v. FCC, 425 F.2d 543, 548 (D.C.Cir.1969) (hereinafter United Church II ); United Church I, supra, 359 F.2d at 1003. These courts have recognized that licensees are "temporary permittees--fiduciaries--of a great public resource * * *," United Church II, supra, 425 F.2d at 548, whose public trustee status is "subject to termination for breach of duty." United Church I, supra, 359 F.2d at 1003.
 
 
 95
 The public interest standard imposes a programming obligation on licensees. Though the paucity of illuminative legislative history accompanying the original Communications Act did not make this requirement entirely clear, subsequent judicial, congressional, and agency interpretations have clarified the existence and attributes of the programming requirement. In the landmark Nat'l Broadcasting Co. v. United States, supra, 319 U.S. 190, 63 S.Ct. 997, 87 L.Ed. 1344, Justice Frankfurter, writing for the Court, held that the regulatory scheme established in the Act necessarily implied a duty to inquire into licensee programming.[8] Subsequent Congresses have added their imprimatur to this reading of the Act. In the course of amending the Act's equal time provision, 47 U.S.C. Sec. 315, in 1959 to exempt candidate appearances on news broadcasts, Congress was careful to state that this new law did not relieve broadcasters of "the obligation imposed upon them under this Act to operate in the public interest and to afford reasonable opportunity for the discussion of conflicting views on issues of public importance." Act of Sept. 14, 1959, Pub.L. No. 86-271, Sec. 1, 73 STAT. 557, amending 47 U.S.C. Sec. 315(a). This language, as the Supreme Court noted in Red Lion, supra, reveals that the amending Congress read the public interest standard as obliging licensees to meet certain programming requirements.[9] The Commission itself has repeatedly articulated its understanding that a programming obligation inheres in the public interest standard.[10] And in the companion to this case, Office of Communication of United Church of Christ v. FCC, supra, 707 F.2d at 1426-1430, we reaffirmed that the Commission is correct in this understanding.
 
 
 96
 Though its precise contours are not fully mapped, the programming aspect of the public interest obligation essentially requires the licensee to provide nonentertainment programming that responds to the needs of the licensee's broadcast community. Id.[11] The Communications Act directs the Commission to police licensees to ensure that they meet their public interest obligations. See 47 U.S.C. Secs. 303, 307, 309, 315. Reviewing a licensee's renewal application, the Commission must therefore determine whether the licensee has fulfilled these obligations to program in the public interest. The licensee in a renewal proceeding must "literally run on his record." United Church I, supra, 359 F.2d at 1007.
 
 B. The Postcard Renewal Plan
 
 97
 The Commission acknowledges that "[a] broadcaster seeking renewal must run on his record, and the focus of that record is whether his programming has served the public interest." Brief for respondents at 14 (emphasis added). Yet the Commission's postcard renewal plan eliminates from the standard renewal application form all questions relating to programming. The tension between the Commission's words and its deeds is obvious; while admitting that past programming is central to the renewal decision, the Commission proposes a scheme that makes no individualized inquiry into the programming of renewal applicants. The Commission seeks to resolve this tension with an argument of the "have your cake and eat it too" variety. What the Commission claims is that the Act imposes on it only a duty to find that each applicant operates in the public interest--not specifically to inquire into each applicant's programming--and that the system of random audits and spot checks, supplemented by complaints from the public, will deter most potential violators of the programming obligation, flag those not deterred, and thereby ensure that licensees program in the public interest while eliminating unneeded paperwork. Given this alternative way of ensuring that programming requirements are met, "[t]he questions contained on the SRA [Simplified Renewal Application] would provide the Commission with adequate information to make its public interest finding consistent with the Communications Act." Decision at 743, JA 9.
 
 
 98
 The rationale for this dramatic shift in the Commission's approach to enforcement is not without some allure. The Commission asserts that under the prior renewal system, which inquired deeply into licensee programming, almost all renewal applicants were found to have met the programming requirements. Moreover, complaints from the broadcaster's community are currently the primary means by which the Commission learns of broadcaster failure to meet programming requirements. Based on these facts, the Commission determined that a combination of deterrence through the threat of audit or inspection and reliance on public complaints would suffice to ensure that licensees programmed in the public interest. Thus, although a licensee would still run on its record at renewal time, the Commission would presume, absent public complaint, that the audit and inspection threat had exerted a deterrent force sufficient to have kept the license faithful to its programming obligations as a public trustee.
 
 
 99
 C. The Statutory Mandate and Underlying Congressional Purposes
 
 
 100
 To ascertain whether the Commission has exceeded its statutory authority, the postcard renewal plan must be measured against the explicit statutory commands of the Communications Act, understood in light of underlying congressional purposes.
 
 
 101
 The Communications Act concentrates the Commission's regulatory efforts at the renewal stage; the renewal decision is the crucible of the regulatory process. Section 307(d) permits renewal "if the Commission finds that public interest, convenience, and necessity would be served thereby." 47 U.S.C. Sec. 307(d). Section 308(b) grants the Commission broad power to require renewal applicants to provide whatever the Commission needs to make its public interest finding. Id. Sec. 308(b). And Section 309(a) is most explicit in its requirement that "the Commission shall determine, in the case of each application filed with it * * *, whether the public interest * * * will be served by the granting of such application." Id. Sec. 309(a) (emphasis added). These words impose on the Commission a mandatory duty to make sure that each renewal applicant has operated in the public interest. FCC v. WNCN Listeners Guild, supra, 450 U.S. at 600, 101 S.Ct. at 1277 ("the Commission does not merely assume but affirmatively determines that the requested renewal * * * will serve the public interest").[12] When these sections are read together with the programming requirement that the public interest standard imposes on each licensee, it becomes clear that the statutory scheme requires the Commission to find that each renewal applicant is providing programming that satisfies the public interest standard.
 
 
 102
 Reviewing courts have consistently read the statute in exactly this way. In Alianza Federal de Mercedes v. FCC, 539 F.2d 732, 735 (D.C.Cir.1976), this court noted that "it has long been basic to the understanding of the renewal process by both Congress and the Commission that a licensee runs on his past record." We similarly found in United Church I, supra, that "in a renewal proceeding past performance is [the Commission's] best criterion." 359 F.2d at 1007. See also id. at 1005 ("on a renewal application the 'campaign pledges' of applicants must be open to comparison with 'performance in office' "); Columbus Broadcasting Coalition v. FCC, 505 F.2d 320, 326 (D.C.Cir.1974) ("a renewal applicant must 'run on his record' in demonstrating that his past performance has been responsive to the needs of his broadcast area").
 
 
 103
 In those cases the court was doing no more than following a long-standing Commission interpretation. Almost a quarter-century ago, in En Banc Programming Inquiry, 44 FCC 2303, 2310 (1960), the Commission set out this interpretation of the Act:
 
 
 104
 [F]aithful discharge of its statutory responsibilities is absolutely necessary in connection with the implacable requirement that the Commission approve no such application for licenses unless it finds that "public interest, convenience, and necessity would be served." While the public interest standard does not provide a blueprint of all of the situations to which it may apply, it does contain a sufficiently precise definition of authority so as to enable the Commission to properly deal with the many and varied occasions which may give rise to its application. A significant element of the public interest is the broadcaster's service to the community. * * *
 
 
 105
 (Emphasis added.) The policy statement bears repeating: the statute requires that "no * * * application" be approved unless the Commission finds that the public interest would be served, a "significant element" of which is the "broadcaster's service to the community." The identical interpretation of the statute permeates later Commission rules and policy statement. See AM & FM Program Form, 1 FCC2d 439, 440 (1965); Comparative Hearings on Renewal Applicants, 22 FCC2d 424, 426 (1970) ("the past record of the renewal applicant is still the critical factor"). Perhaps the strongest rendition of this interpretation is contained in FCC Form 303, supra, 59 FCC2d at 752. In that rulemaking proceeding the Commission sought to simplify the renewal application then in use by removing duplicative or irrelevant requests for information. In doing so, however, the Commission explicitly recognized that the Communications Act places upon it a statutory duty to evaluate the programming performance of each renewal applicant:In each case involving a renewal application the Commission is required to review the licensee's overall performance during the preceding license term and to make an affirmative finding that grant of the subject application would serve the public interest, convenience, and necessity. * * *
 
 
 106
 * * * Sufficient information upon which to assess the licensee's performance and to predicate the required public interest finding must continue to be elicited. * * *
 
 
 107
 Id. at 752 (emphasis added). These quotations from Commission rules and policy statements leave little doubt that, prior to its recent about-face, the Commission consistently read the Act as mandating an inquiry into the programming of each and every renewal applicant.[13]
 
 
 108
 That the Commission for so long held this view of the Act is not surprising. This reading reflects the centrality of the "public trust" concept that animates the regulatory scheme. Each licensee receives a slice of the public domain extraordinarily lucrative in its potential, and must in return provide programming that serves the needs of its broadcast community. The Act directs the Commission to ensure that each licensee meets its obligations as a public trustee. The Act, furthermore, makes explicit the requirement that an affirmative, individualized public interest finding be made for each licensee. Since the Commission carries out this statutory duty primarily through the renewal process, the process must be structured to permit the Commission to ensure that each licensee lives up to its public trust obligations. The Commission can only do so by evaluating the programming of each licensee. To further the congressional purposes implicit in the public trust concept, the affirmative, individualized public interest finding that Sections 307 and 309 of the Act mandate must be read as requiring the Commission to evaluate the programming of each renewal applicant.[14]
 
 
 109
 What is surprising, rather, is that the Commission would now seek to undermine this understanding of the Act--and that the majority of this panel would go along. The Commission attempts to achieve its goal of rewriting the statute by a process of recharacterizing its earlier view of its statutory responsibilities. The Commission now claims that when it stated previously that programming inquiries were essential to the renewal process, it was not interpreting the statute per se, but merely exercising its broad discretion to propound whatever procedures it thought appropriate under the public interest standard. Now in an equally permissible exercise of discretion, the Commission claims, it is discarding the old programming inquiries as cumbersome and replacing them with the postcard renewal plan. To support this shift in approach the Commission claims that the statute does not mandate a renewal form that inquires into the programming of each applicant and that the random audits and inspections, supplemented by public complaints, will permit the Commission to meet its duty of ensuring programming in the public interest. Neither prong of the Commission's rationale withstands analysis.
 
 
 110
 1. The statute requires a programming inquiry.
 
 
 111
 Both the Commission and the majority opinion here assert that the Communications Act does not require the Commission's renewal application to inquire into each applicant's programming. Casting the issue in this way, they avoid the real question that must be answered in this case: whether the Commission can, consistent with the Communications Act, make no inquiry into the programming of 99 percent of its renewal applications. Without a doubt, the precise content of the renewal application form is left largely to the discretion of the Commission. But it does not follow from this proposition that the Commission need not review the programming of each renewal applicant. The Commission's plan is only valid if the Act does not mandate such individualized inquiry. Thus, even if the Commission can show that the statutory words do not explicitly require a renewal application with programming questions, the Commission has not thereby proven that the statutory scheme does not require an inquiry into the programming of each renewal applicant. The reasoning of this court's majority opinion is directed only toward proving the former, and therefore does not address itself to the critical issue in this case.
 
 
 112
 Nonetheless, since the Commission's plan does not provide for an examination of the programming of each renewal applicant, it must be assumed that the Commission and the majority here have implicitly decided that the Act does not mandate such individualized inquiry. It has already been demonstrated that this view flatly contradicts the position that the Commission has held and expounded for at least the past 40 years. To the extent that this court's analysis can be viewed as implicitly addressed to this underlying issue of whether the Act mandates an inquiry into each applicant's programming, that analysis also falls of its own weight.
 
 
 113
 The majority correctly notes that nothing on the face of the Act explicitly requires that programming inquiries be included on all applications for renewal. Majority Opinion (Maj. Op.) at 412. Section 308(b), a non-exhaustive list of items into which the Commission may inquire, is the centerpiece of this argument. The section does not include programming inquiries on its list, and does leave the Commission with discretion as to what information it may require licensees to supply. Yet to extrapolate from these words a holding that the Commission need not inquire into programming is to resurrect the discredited "plain meaning rule" in its worst aspect. See United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345 (1940). Section 308 must take its meaning from the regulatory scheme of which it forms a part, and from the purposes and animating concepts of the statute. In Section 308 Congress intended to give the Commission the ability to solicit all information "it may require," 47 U.S.C. Sec. 308(b) (emphasis added), to carry out its affirmative obligation of ensuring that each renewal applicant has operated in the public interest. The grant was undoubtedly phrased in these general terms not to permit the Commission to inquire or not as it saw fit, but to ensure that the statute implied no limitations on the Commission's power to gather all needed information. Since the statutory scheme requires the Commission to ensure that each applicant has met its public interest programming obligations, Section 308 cannot be read as giving the Commission the authority to nullify this mandate in the name of convenience.[15]
 
 
 114
 The majority draws similarly faulty lessons from its thin reading of subsequent congressional and agency interpretations of the Act. In the 1952 amendments to the Act, on which the majority places significant weight, Congress did seek to "reduce the regulatory burden," Maj. Op. at 412, but not in the way that the majority claims. Prior to the amendments the Act required that renewal applications "be limited to and governed by the same considerations and practice which affects the granting of original applications." The amendment substituted for this yardstick the broader "public interest" standard that is now in Section 307. This revision eased the regulatory burden by freeing the Commission from making inquiries that, while sensible when addressed to initial applicants for licenses, were not sensible when addressed to renewal applicants. For example, the pre-1952 practice required the Commission to consider the financial ability of both initial and renewal applicants to construct a broadcast station. A renewal applicant, however, would already have built the station, and inquiry into its financial ability to do so would thus be senseless. See S.Rep. No. 44, 82d Cong., 1st Sess. 7 (1951).
 
 
 115
 These eminently reasonable statutory adjustments cannot be read to support the majority's extravagant claim that Congress "wanted to * * * grant the FCC discretion to tailor the renewal form as it saw fit." Maj. Op. at 412. And not only this logic, but also a page of history refutes the majority's interpretation. According to the Senate report, the amendment to Section 307 "does not in any way impair the Commission's right and duty to consider, in the case of a station which has been in operation and is applying for renewal, the over-all performance of that station against the broad standard of public interest, convenience, and necessity." S.Rep. No. 44, supra, at 7.[16]
 
 
 116
 The majority also relies on two aspects of agency practice under the statute to support its holding: (i) the Commission's frequent addition and subtraction of questions on renewal forms, and (ii) the Commission's policy of policing compliance with the fairness doctrine on an ad hoc basis, rather than through renewal applications. In each case the majority's reliance is misplaced.
 
 
 117
 Though the Commission has frequently modified the questions on its renewal applications, in every case these modifications merely refined the methods of inquiry by which the Commission assured itself that renewal applicants had met programming requirements. See Part I-A supra. In its 1975 revision, which greatly simplified the renewal application, the Commission articulated the understanding of the statute that guided its revision process:
 
 
 118
 * * * [W]e cannot, in the interest of alleviating the paperwork burden faced by our licensees, pay only lip service to our statutory responsibilities. Our re-regulatory goal is the improvement of the renewal process through the clarification and refinement of our reporting requirements and the elimination of antiquated and unnecessary disclosures. Sufficient information upon which to assess the licensee's performance and to predicate the required public interest finding must continue to be elicited. * * *
 
 
 119
 FCC Form 303, supra, 59 FCC2d at 752. The power to refine renewal inquiries is certainly within the Commission's discretion, and the majority is correct when it states that "if the FCC can add specific questions, it can delete them when circumstances warrant." Maj. Op. at 412. But it does not follow from that proposition that the Commission can eliminate all programming inquiries and substitute nothing in their place. Only legerdemain can transform the Commission's discretion to refine the renewal process into the power to obliterate its core function.
 
 
 120
 Nor does the Commission's policy of ad hoc enforcement of the fairness doctrine support the majority's position that the Commission may eliminate all programming inquiries from renewal applications. As this court noted in Nat'l Citizens Committee for Broadcasting v. FCC, 567 F.2d 1095, 1111, 1116 (D.C.Cir.1977), when the Commission decided to enforce the fairness doctrine on a case-by-case basis, rather than solely during the renewal process, this action intensified scrutiny of broadcasters. An intervenor in Commission proceedings had proposed that the Commission police compliance with the fairness doctrine through renewals so as to minimize the "amount of government interference in the everyday editorial decisions of licensees." 567 F.2d at 1115. The Commission rejected this approach because "review only at the time of renewal would discourage the filing of specific complaints from persons who sought to present opposing views in a timely fashion and would deny the Commission the ability to 'remedy violations before a flagrant pattern of abuse develops.' " Id. at 1116 (quoting Fairness Report, 48 FCC2d 1, 18 (1974)).
 
 
 121
 The Commission was unquestionably within the bounds of its delegated power when it decided to intensify its review to meet the urgency of a fairness doctrine complaint alleging one-sided presentation of an important issue. But this power to intensify review does not imply a concomitant power to slacken review. Moreover, the case-by-case review process was specifically tailored to meet the need of permitting a prompt response to a controversial view on a pressing issue, and thereby furthered the purposes of the Communications Act. No similar exigency justifies the Commission's present decision to relax scrutiny of licensee compliance with programming requirements, and such a step furthers no statutory purpose. Thus the majority opinion can draw no sustenance from the Commission's fairness doctrine enforcement policies.[17]
 
 
 122
 The argument that the Communications Act does not impose on the Commission a duty to inquire into the programming of each renewal applicant is untenable. The statutory language, the legislative history, and the administrative practices that the majority has mustered to support this view are neither jointly nor severally able to bear the weight that the majority must necessarily put upon them to prove its point. Since the validity of the Commission's stated position that the Act does not require a renewal application with programming inquiries hinges on the validity of this unstated, but necessary, point, the Commission's plan must fall. Until the Commission's postcard renewal plan, it had been thought beyond cavil that the Communications Act mandated individual programming inquiries. The Commission cannot now rewrite the statute by claiming that for the past 40 years when it said the Act imposed an affirmative duty to find that each renewal applicant programmed in the public interest, what it really meant was that the statute gave it discretion to decide whether or not to make such an inquiry. The Commission, the courts, and implicitly the Congress, have consistently held the contrary view. The weak reading of the statute that the majority has presented to support the Commission's new-found discretion only reconfirms that the Commission has been right for the last 40 years and is wrong now.
 
 
 123
 2. The Commission's alternative means of regulating programming is inadequate.
 
 
 124
 Though it eliminated individualized programming inquiries, the postcard renewal plan did acknowledge the Commission's duty under the Communications Act to ensure that licensees presented programming in the public interest. To meet this obligation the Commission proposed the trio of long-form audit, on-site inspection, and public participation. That approach would ensure programming in the public interest, the Commission claimed, because the threat of audit or inspection would provide "sufficient inducement to comply" with programming requirements, Decision at 750, JA 16, and because public complaints--traditionally the "best vehicle" for apprising the Commission of violations, Notice at 2, JA 48--would flag those broadcasters not sufficiently induced by the audit threat.
 
 
 125
 The Commission proposed this alternative enforcement scheme in coordination with its decision to eliminate all programming inquiries from renewal forms, and this alternative plan is, like the postcard renewal application itself, based on the erroneous premise that the Act does not mandate individualized programming inquiries. That the plan would require examination of the programming of so few licensees is sufficient to invalidate it as inconsistent with the mandates of the Communications Act. The plan is, moreover, riddled with illogic.
 
 
 126
 The Commission asserts that the threat of audit or inspection will provide an element of deterrence sufficient to ensure broadcasting in the public interest. And the majority opinion agrees that "the regulatory environment provides strong incentives for operation in the public interest." Maj. Op. at 416. In the light of the Commission's contemporaneous decision to exempt all commercial radio licensees from the audit requirement, see Decision at 748-749, JA 14-15, this claim is absurd. Of the 10,400 holders of broadcast licenses in this country approximately 8,100 are commercial radio licensees. See brief for petitioners Black Citizens for a Fair Media et al. at 25 (citing FCC, 46 TH ANNUAL REPORT/FISCAL YEAR 1980 at 90). Thus virtually 80 percent of all licensees are not subject to the mechanism that the FCC claims will deter broadcaster misfeasance. The remaining 20 percent of broadcasters--commercial television and noncommercial radio and television licensees--face only one chance in 20 of being subject to the long-form audit in any given year.[18]
 
 
 127
 The Commission also contends that complaints from the viewing and listening public will pinpoint broadcasters that are not meeting public interest programming obligations. The Commission claims that since public complaints are currently the primary means by which it learns of broadcaster transgressions, it can ensure that most broadcasters program in the public interest simply by responding to such public complaints. That, however, is a non sequitur. Reliance on public participation to ensure that most violators of the programming obligation are caught is only valid if it can be shown that the public complains about most violators. The Commission has not even attempted to make such a showing. And it is unlikely that it could do so. The high cost of participation, in time and money, exerts a strong constraining pressure on the public. As this court noted in another case involving the Commission's license renewal procedures: "Always a restraining factor is the expense of participation in the administrative process, an economic reality which will operate to limit the number of those who will seek participation." United Church I, supra, 359 F.2d at 1006. Reliance on public complaints simply does not assure that most broadcasters will present programming that meets public interest obligations.
 
 
 128
 The postcard renewal plan essentially creates a presumption that a renewal applicant has met its public interest programming obligations. The plan holds out some possibility of deterrence, but the odds are long. Twenty percent of licensees, the noncommercial broadcasters and commercial television stations, face a one in 20 chance of audit and a one in ten chance of inspection of their public files. Eighty percent of licensees, the commercial radio stations, face only the one in ten risk of inspection. Most of the burden for monitoring licensee programming under this plan rests with the public. Absent public complaint, the Commission will "assume continued compliance." Decision at 748, JA 14.
 
 
 129
 That is the rub. This policy of assuming continued compliance with public interest obligations cannot be squared with the explicit command of the statutory scheme that "the Commission shall determine, in the case of each application filed with it * * *, whether the public interest, convenience, and necessity will be served by the granting of such application * * *." 47 U.S.C. Sec. 309(a) (emphasis added). See FCC v. WNCN Listeners Guild, supra, 450 U.S. at 601, 101 S.Ct. at 1277 ("the Commission does not merely assume but affirmatively determines that the requested renewal * * * will serve the public interest"); United Church I, supra, 359 F.2d at 1008 ("The statutory public interest finding cannot be inferred from a statement of the obvious truth that a properly operated station will serve the public interest."). The postcard renewal plans falls far short of the statute's mandate that the Commission ensure that each renewal applicant has presented programming in the public interest. In so doing, the plan frustrates the essential purpose of the Communications Act: assuring that the public, the owner of the airwaves, receives programming that meets community needs. Until it proposed this plan, the Commission had held the firm belief that the Act required an inquiry into the programming of each renewal applicant. The Commission was correct. The postcard renewal plan does not meet the Act's requirements, and this court errs in upholding it.
 
 IV. CONCLUSION
 
 130
 Like many of its sister agencies, the Commission has in recent years taken up the sword against long-standing federal regulatory policies. In Office of Communication of United Church of Christ v. FCC, supra, 707 F.2d 1413, this court approved most of the Commission's efforts to deregulate commercial radio, but only after we conducted a careful review of the statutory scheme. Our decision hinged on a finding that the Commission's deregulatory plan left intact the statutory requirement that radio broadcasters present nonentertainment programming to meet the community needs of their audiences. 707 F.2d at 1426-1430. In the present controversy, the Commission has cut away too much. The postcard renewal plan contravenes the statutory mandates and underlying purposes of the Communications Act; under the plan the Commission does not make the statutorily required affirmative finding that each renewal applicant has presented programming in the public interest. See 47 U.S.C. Sec. 309(a). In effect, the Commission has relegated itself to the role of a traffic cop, policing to ensure that licensees meet technical requirements, but doing little more. Forty years ago, Justice Frankfurter rejected such a narrow conception of the Commission's duties under the Act: "the Act does not restrict the Commission merely to supervision of the traffic. It puts upon the Commission the burden of determining the composition of that traffic." Nat'l Broadcasting Co. v. United States, supra, 319 U.S. at 215-216, 63 S.Ct. at 1009-1010.
 
 
 131
 This burden has proven to be substantial. Without a doubt the postcard renewal plan makes life easier for both the regulators and the regulated. But the statute imposes this burden, and the Commission is not free to shirk it. To do so is to place administrative convenience ahead of the protection of the public interest that Congress intended in this regulatory scheme. The Commission's decision to favor administrative convenience is troubling. The decision indicates that the Commission has--like the broadcasters before it, see United Church I, supra, 359 F.2d at 1003--lost sight of the fact that a broadcast license is a public trust. The public, as owner of the airwaves, deserves more protection than the Commission's postcard renewal plan provides. The Communications Act mandates this protection in the form of an examination of the programming of each renewal applicant. This court errs in sanctioning the Commission's effort to shirk these statutory responsibilities.
 
 
 132
 I respectfully dissent.
 
 
 
 *
 Sitting by designation pursuant to 28 U.S.C. Sec. 294(d)
 
 
 [1]
 Petitioners also include Henry Geller, Chinese for Affirmative Action, National Council of La Raza, and the NAACP
 
 
 [2]
 A summary of this Notice may be found at 45 Fed.Reg. 47,444 (1980)
 
 
 [3]
 As the Commission noted, the commercial television application was 21 pages long, the non-commercial television application was 15 pages long, and the commercial radio form, while only two pages, was still a "substantial filing" by the time exhibits and attachments were added. Notice at 1
 
 
 [4]
 These questions include (1) the licensee's name and location, (2) whether the licensee has filed annual employment reports, (3) whether the license is in compliance with section 310 of the Communications Act which deals with alien control or ownership of broadcast stations, (4) whether a court or tribunal has entered an adverse finding as to particular conduct bearing on a licensee's character, and (5) whether a licensee has placed all required documents in its public file. Notice, Appendix A
 
 
 [5]
 Radio stations would not have to include such information under the FCC's radio deregulations. See Office of Communication of the United Church of Christ v. FCC, 707 F.2d 1413 (D.C.Cir.1983)
 
 
 [6]
 Radio Broadcast Services: Revision of Applications for Renewal of License of Commercial and Noncommercial AM, FM, and Television Licensees, 49 Rad.Reg.2d (P & F) 740, 747 (1981)
 
 
 [7]
 Former subsection (d) of section 307 was redesignated subsection (c) and amended by the Communications Amendments Act of 1982, Pub.L. No. 97-259, Sec. 112, 96 Stat. 1087, 1093
 
 
 [8]
 Petitioners also complain about the elimination of questions relating to certain entertainment programming such as children's programming
 
 
 [9]
 Section 308(b) provides:
 All applications for station licenses, or modifications or renewals thereof, shall set forth such facts as the Commission by regulation may prescribe as to the citizenship, character, and financial, technical, and other qualifications of the applicant to operate the station; the ownership and location of the proposed station and of the stations, if any, with which it is proposed to communicate; the frequencies and the power desired to be used; the hours of the day or other periods of time during which it is proposed to operate the station; the purposes for which the station is to be used; and such other information as it may require. The Commission, at any time after the filing of such original application and during the term of any such license, may require from an applicant or licensee further written statements of fact to enable it to determine whether such original application should be granted or denied or such license revoked. Such application and/or such statement of fact shall be signed by the applicant and/or licensee.
 47 U.S.C. Sec. 308(b) (1976).
 
 
 [10]
 The Report notes:
 Considerable dissatisfaction was expressed ... with the burdensome requirements which applicants for renewal sometimes have been compelled to meet in the way of furnishing detailed information.
 H.R.Rep. No. 1750, supra, at 8, reprinted in 1952 U.S.Code Cong. & Ad.News at 2242.
 
 
 [11]
 See Commission En Banc Programming Inquiry, 44 F.C.C. 2303, 2316 (1960); Formulation of Rules and Policies Relating to the Renewal of Broadcast Licenses, 43 F.C.C.2d 1, 57 (1973)
 
 
 [12]
 The statute does require the inclusion of certain technical information such as the nature of licensee ownership, although it does not prescribe specific questions. 47 U.S.C. Sec. 308(b) (1976)
 
 
 [13]
 National Tour Brokers is in many ways analogous to this case. In the former, the National Tour Brokers Association challenged the ICC's simplification of its licensing procedures for passenger tour brokers. The court upheld the agency's action noting that the statute did not mandate the previous licensing system and that "[i]n the absence of a definition of 'public interest' by Congress that would require individual case-by-case determinations, the ICC was within its authority to utilize a general finding that the public interest is served by the licensing of 'fit' applicants as brokers." 671 F.2d at 531
 
 
 [14]
 Petitioners concede that the great majority of broadcasters "are responsible and will follow the policies, with or without these supplementary procedures." Brief for Petitioner Henry Geller at 11. Thus, the question is whether the renewal system will ferret out the few broadcasters who do not comply with the substantive policies
 
 
 [15]
 From all indications, the public has not been reticent about registering complaints. During the 12-month period through October 1981, approximately 3000 programming-related complaints were sent to the FCC, not including organized write-in campaigns. Brief for FCC at 22 n. 25
 
 
 [16]
 It should be noted that the Decision is premised, in part, on the Commission's belief that sufficient information is available in the public file
 
 
 [17]
 Licensees must certify on the renewal application that all required information has been placed in the public file. If a licensee so stated but in fact failed to provide such information, it would commit a serious violation and would be subject to FCC sanctions
 
 
 [18]
 Reconsideration Decision at 1129. The Commission has defined a "substantial deviation," the occurrence of which requires an update, as a 15% decrease in any one of the three nonentertainment categories or as a 20% decrease overall. Id. at 1129 n. 5
 
 
 [19]
 Petitioners contend that raw logs are unhelpful because they contain such a large number of data that a long, painstaking analysis is required if the logs are to provide information as to a licensee's performance. The petitioners would prefer composite week logs which tabulate into programming categories a licensee's programming. Thus, petitioners specifically complain about the FCC's elimination of Form 303-A, a yearly tabulation of composite week logs in which percentage figures for news, public affairs, and "others" (exclusive of entertainment and sports) are listed
 The FCC eliminated Form 303-A because in its view the burden on the licensee of completing the form was unwarranted. Reconsideration Decision at 1128. However, the citation accompanying this statement refers to a paragraph of the Decision which discusses the burden on the Commission. Decision at 754-55. Either of these burden reductions is an advantage the Commission is entitled to weigh in its decision; under the new system, the Commission need not review the logs and the licensee is not required to prepare them (although it may do so). The assessment of this benefit and the importance of tabulated logs we leave to the Commission. There is clearly no explicit statutory requirement that either the Commission or the licensee tabulate these data. Indeed, the Commission did not require the submission of Form 303-A until 1973. Renewal of Broadcast Licenses, 43 F.C.C.2d 1, 70 (1973).
 
 
 [20]
 Petitioner BCFM also complains that the FCC's decision to eliminate required bi-monthly public service announcements which inform the public of the licensee's obligation to operate in the public interest and of the various ways for the public to express its views about the licensee's performance. (The FCC retained the requirement that licensees make such announcements during the six months prior to the renewal date.)
 The complaint is unfounded because the Commission made a specific finding that the announcement did not generate public participation. Petitioners offer nothing other than their own opinion to contradict this finding. Accordingly, we uphold the Commission's action.
 
 
 [21]
 This list consists of issues which the licensee has determined are important to the community and programs broadcast in response to those issues
 
 
 [22]
 While this list is placed in the public files, it is not submitted to the FCC. This does not detract from the list's importance, however, because the list provides information to the public, and it is the public's reaction--either complaints or silence--which in turn provides information to the Commission
 
 
 [23]
 The inference is also supported by the Commission's traditional limited reliance on licensee good faith
 
 
 [24]
 The Conference Report noted:
 [T]he extension of terms for broadcast licensees would help to reduce costs to broadcasting and the Commission costs, while at the same time allowing the Commission to do a better job reviewing broadcasters' performance.
 H.R.Rep. No. 208, 97th Cong., 1st Sess. 895 (Conference Report), reprinted in 1981 U.S.Code Cong. & Ad.News 1010, 1257.
 
 
 [25]
 In emphasizing that we pay special attention to changes in agency policy, we have sometimes referred to our scrutiny as being "heightened." E.g., NAACP v. FCC, 682 F.2d 993, 998 (D.C.Cir.1982). Of course, this scrutiny consists in ensuring that "the agency was aware it was changing its views and has articulated permissible reasons for the change, and also that the new position is consistent with the law." Id. We take pains to ensure that an agency knows what it is doing in enacting a new rule and closely scrutinize any agency action to assess both the reasons articulated and the action's conformity with law. In other words, the nature of our scrutiny is the same whether the action is wholly new or a revision of an older rule; a change is another factor to scrutinize, not a warrant for employing a different standard of review. Our scrutiny is heightened in that it includes this additional factor
 
 
 [26]
 In support of this assertion, petitioners point to the following language:
 We observe that over the years most licensees have met or exceeded our operating guidelines and a renewal process which has consumed substantial Commission resources has resulted in few applications designated for hearing for failure to comply with our rules and policies.
 Decision at 743. This statement was not the basis of the FCC's decision; rather, it was merely an observation that the previous guidelines were to some degree excessive. The more important basis of the decision was that the new system would work equally well.
 
 
 [27]
 Petitioners state:
 The abandonment of efficacious procedures, on the ground, that they were efficacious, hardly constitutes reasoned decision-making. If anything, the Commission's rationale merely confirms the continued need for the traditional renewal procedures ....
 Brief for Petitioners BCFM at 40.
 
 
 [28]
 Petitioners also assert that reasoned decision-making requires a comparative assessment of the two renewal schemes and implies that the FCC should have conducted a study of some kind. This argument is without merit. The FCC's expertise permits it to make the decision without resorting to an independent study. See NAACP v. FCC, 682 F.2d at 1001 (rejecting argument that FCC should have conducted independent study prior to changing its Top-Fifty Policy)
 
 
 [29]
 In National Tour Brokers, 671 F.2d at 533, the court found that the ICC's decision to simplify licensing procedures was not unreasoned because the "decision was based on the Commission's long experience administering the existing license rules and its consequential dissatisfaction with those procedures." Similarly, in this case, the FCC's experience, which is fully documented in the record, provides a reasoned and rational basis for the decision
 
 
 [1]
 The Commission stated:
 In each case involving a renewal application the Commission is required to review the licensee's overall performance during the preceding license term and to make an affirmative finding that grant of the subject application would serve the public interest, convenience, and necessity. * * *
 * * * Sufficient information upon which to assess the licensee's performance and to predicate the required public interest finding must continue to be elicited. * * *
 FCC Form 303, 59 FCC2d at 752.
 
 
 [2]
 The application forms varied somewhat for different types of licensees. The application for commercial television stations was 21 pages long. The application for noncommercial television and radio stations was 15 pages long. And the application for commercial radio stations was only two pages long, but when attachments were added as required even this form was a "substantial filing." See Revision of Applications for Renewal of License of Commercial and Noncommercial AM, FM and Television Licensees, FCC 80-327 (July 11, 1980) (hereinafter Notice ), Joint Appendix (JA) 47
 
 
 [3]
 In this opinion the Commission's new plan will be referred to as the "postcard renewal plan."
 
 
 [4]
 Henry Geller, a petitioner in this action, brought the petition for reconsideration before the Commission
 
 
 [5]
 See generally Monaghan, Marbury and the Administrative State, 83 COLUM.L.REV. 1, 25-34 (1983) ("Judicial deference to agency 'interpretation' of law is simply one way of recognizing a delegation of law-making authority to an agency.")
 
 
 [6]
 As Justice Jackson once argued:
 [A]dministrative experience is of weight in judicial review only to this point--it is a persuasive reason for deference to the Commission in the exercise of its discretionary powers under and within the law. It cannot be invoked to support action outside of the law. And what action is, and what is not, within the law must be determined by courts * * *. * * *
 SEC v. Chenery Corp., 332 U.S. 194, 215, 67 S.Ct. 1760, 1762, 91 L.Ed. 1995 (1947) (Jackson, J., dissenting).
 
 
 [7]
 Because I would hold that the postcard renewal plan fundamentally contravenes congressional intent, I would not reach the issue of whether the Commission's plan was the product of reasoned decisionmaking
 
 
 [8]
 The opinion stated:
 [W]e are asked to regard the Commission as a kind of traffic officer, policing the wave lengths to prevent stations from interfering with each other. But the Act does not restrict the Commission merely to supervision of the traffic. It puts upon the Commission the burden of determining the composition of that traffic. * * *
 * * *
 * * * "An important element of public interest and convenience affecting the issue of a license is the ability of the licensee to render the best practicable service to the community reached by his broadcasts." Federal Communications Comm'n v. Sanders Radio Station, 309 U.S. 470, 475 [60 S.Ct. 693, 697, 84 L.Ed. 869]. The Commission's licensing function cannot be discharged, therefore, merely by finding that there are no technological objections to the granting of a license. If the criterion of "public interest" were limited to such matters, how could the Commission choose between two applicants for the same facilities, each of whom is financially and technically qualified to operate a station? Since the very inception of federal regulation [of] radio, comparative considerations as to the services to be rendered have governed the application of the standard of "public interest, convenience, or necessity." * * *
 Nat'l Broadcasting Co. v. United States, 319 U.S. 190, 215-217, 63 S.Ct. 997, 1009-1010, 87 L.Ed. 1344 (1943).
 Commentators have also recognized that the structure of the Act's regulatory scheme, governed by the public trust concept, necessarily implies the power to examine licensee programming. See S. BREYER & R. STEWART, ADMINISTRATIVE LAW AND REGULATORY POLICY 374 (1979) ("Surely a Commission asked to award licenses in the public interest must have 'good programming' as some kind of objective; to ignore programming entirely would make a mockery of its mission.").
 
 
 [9]
 Red Lion Broadcasting Co. v. FCC, 395 U.S. 367, 380, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969) ("public interest" creates programming duty); see Banzhaf v. FCC, 405 F.2d 1082, 1095 n. 49 (D.C.Cir.1968) ("At the very least, this language appears to be an acknowledgment of and acquiescence in the settled Commission and judicial construction that the public interest standard applies to program content."). Such subsequent congressional declarations of the intent of an earlier Congress are normally entitled to "great weight in statutory construction." Red Lion, supra, 395 U.S. at 380, 89 S.Ct. at 1801; accord, FHA v. The Darlington, Inc., 358 U.S. 84, 90, 79 S.Ct. 141, 145, 3 L.Ed.2d 132 (1958)
 
 
 [10]
 See, e.g., En Banc Programming Inquiry, 44 FCC 2303 (1960); Television Program Form, 5 FCC2d 175 (1966); Renewal of Broadcast Licenses, 44 FCC2d 405 (1973); FCC Form 303 Report and Order, 59 FCC2d 750 (1976). See also FCC policy statements discussed in Office of Communication of United Church of Christ v. FCC, 707 F.2d 1413, 1429 n. 50 (D.C.Cir.1983). Congress has never overturned, or even questioned, this consistent administrative interpretation of the Act. This congressional acquiescence constitutes persuasive evidence that the Commission's interpretation is the one intended by Congress. See, e.g., Haig v. Agee, 453 U.S. 280, 300, 101 S.Ct. 2766, 2778, 69 L.Ed.2d 640 (1981); Red Lion, supra note 9, 395 U.S. at 381-382, 89 S.Ct. at 1801-1802; Zemel v. Rusk, 381 U.S. 1, 11-12, 85 S.Ct. 1271, 1278-1279, 14 L.Ed.2d 179 (1965)
 
 
 [11]
 Broadcasters must also meet programming obligations under the fairness doctrine. That doctrine requires broadcasters to provide coverage of controversial and important issues and to present opposing points of view on controversial issues. Red Lion, supra note 9, 395 U.S. at 377-378, 89 S.Ct. at 1799-1800. These requirements originally grew out of the general public interest obligation of the Communications Act. See S. SIMMONS, THE FAIRNESS DOCTRINE AND THE MEDIA 16-56 (1978). Red Lion held that when Congress amended the Act in 1959 it specifically intended to codify the fairness doctrine as a statutory requirement. 395 U.S. at 380-385, 89 S.Ct. at 1801-1804. Though there is a significant overlap between the programming requirements of the first part of the fairness doctrine and those of the general public interest programming standard, see note 17 infra, these requirements are theoretically distinct
 
 
 [12]
 The statute's use of the word "shall" presumptively implies that Congress intended to impose a mandatory duty upon the Commission. See Ass'n of American Railroads v. Costle, 562 F.2d 1310, 1312 (D.C.Cir.1977). See generally C. SANDS, SUTHERLAND STATUTORY CONSTRUCTION Sec. 57.03, at 415-417 (4th ed. 1973)
 
 
 [13]
 Additional evidence that the Commission read the statute this way can be found in statements contained in FCC license renewal applications. Application forms from 1974, 1976, and 1980 contain the following language:
 Pursuant to the Communications Act of 1934, as amended, the Commission cannot grant, renew or modify a broadcast authorization unless it makes an affirmative finding that the operation of the station, as proposed, will serve the public interest, convenience and necessity. Programming is of the essence of broadcasting.
 Appendix B to brief for petitioners Black Citizens for a Fair Media et al. at 33, 54, 70.
 
 
 [14]
 Long congressional acquiescence in this consistent agency and judicial interpretation provides persuasive evidence that this interpretation is the one intended by Congress. Haig v. Agee, supra note 10, 453 U.S. at 300, 101 S.Ct. at 2778; Red Lion, supra note 9, 395 U.S. at 381, 89 S.Ct. at 1802; Zemel v. Rusk, supra note 10, 381 U.S. at 11, 85 S.Ct. at 1278. Haig v. Agee stated that "congressional acquiescence may sometimes be found from nothing more than silence in the face of an administrative policy." 453 U.S. at 300, 101 S.Ct. at 2778. More recently, however, the Supreme Court stressed, in Bob Jones University v. United States, --- U.S. ----, ----, 103 S.Ct. 2017, 2032, 76 L.Ed.2d 157 (1983), that an important factor in determining the weight to be given congressional acquiescence in an agency interpretation is the extent of Congress' familiarity with that interpretation
 In the present case, evidence exists of congressional familiarity with, and approval of, the Commission's understanding that the Communications Act mandated an inquiry into the programming of each renewal applicant. Some evidence is contained in the House report accompanying H.R. 12993, a bill that passed House and Senate in different forms during the 93rd Congress but was never reconciled and enacted into law. This bill proposed alterations in the programming inquiries for renewal applicants. The House report indicated a clear belief that under "existing law" the "ultimate test" for renewal was whether the licensee had met public interest programming requirements, and stated that the bill sought only to amend the particulars of the programming inquiry. See H.R.Rep. No. 93-961, 93d Cong., 2d Sess. 16-17 (1974).
 Moreover, Congress has on several occasions over the years amended the Communications Act, and at no time during any amending process did Congress express disapproval of the long-standing Commission interpretation of the Act as requiring individualized programming inquiries. "Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change." Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran, 456 U.S. 353, 382 n. 66, 102 S.Ct. 1825, 1841 n. 66, 72 L.Ed.2d 182 (1982). Similarly, when Congress amended Sec. 307 of the Act in 1952, it not only refused to alter the Commission's understanding of the public interest renewal standard embodied in that section, see Part I-A supra, but it also explicitly stated that it intended no change in the Commission's "duty to consider, in the case of a station which has been in operation and is applying for renewal, the over-all performance of that station against the broad standard of public interest, convenience, and necessity." S.Rep. No. 44, 82d Cong., 1st Sess. 7 (1951) (emphasis added). Thus it is clear that Congress has been aware of the Commission's traditional interpretation of the Act, has acquiesced in that interpretation, and has on occasion articulated its explicit concurrence with that interpretation.
 
 
 [15]
 Nat'l Ass'n of Regulatory Utility Comm'rs v. FCC, 525 F.2d 630, 645 (D.C.Cir.1976), should not be read as indicating a contrary result. The case was based on a narrow holding that the Commission need not inquire into the financial fitness of applicants for licenses to operate land mobile radio services if the Commission "deems [such information] irrelevant to its statutory scheme." 525 F.2d at 645. In discussing Sec. 308(b) the opinion did state that the statutory language "leaves the Commission free to have no facts set forth on any of these matters, if it finds such action appropriate * * *." Id. But this overbroad dictum was immediately qualified by the statement that the Commission can only ignore those factors it considers irrelevant to the statutory scheme. Id. No such claim could be made about programming inquiries in the present controversy
 
 
 [16]
 If anything, the 1952 amendment facilitated broader inquiry into programming. Since, under the prior statute, new and renewal applicants had to be evaluated under identical criteria, and new applicants would have no programming to measure, a renewal applicant in theory could not have its programming evaluated
 
 
 [17]
 The fairness doctrine of course comprises two obligations: (i) the broadcaster must provide coverage of controversial and important issues, and (ii) the broadcaster must present opposing points of view on controversial issues. See note 11 supra. The Commission's case-by-case enforcement process is particularly concerned with facilitating the Commission's ability to ensure that licensees abide by the requirements of the second part of the doctrine. Case-by-case enforcement is admittedly less well suited to policing the first part of the doctrine. In fact the Commission traditionally has not focused its enforcement efforts on the first part. Nat'l Citizens Committee for Broadcasting v. FCC, 567 F.2d 1095, 1100 n. 13 (D.C.Cir.1977)
 This fact should not, however, be understood as implying that the Commission is under no affirmative obligation to ensure that each licensee meets its obligations under both parts of the doctrine. The Commission's traditional practice of eliciting on renewal applications information about the extent to which a licensee's nonentertainment programming served the needs of its listeners--though directed toward the general public interest finding required for renewal--may well have permitted the Commission to ensure that licensees were meeting their obligation under part one of the fairness doctrine as well. Commentators have noted the convergence of the requirements of the fairness doctrine and the general public interest programming standard. See, e.g., S. SIMMONS, supra note 11, at 222-228 (suggesting that part one obligations could be policed through existing license renewal procedures that focus on licensee programming in the public interest). In essence, part one of the fairness doctrine imposes on broadcasters a requirement that "the American public not be left uninformed," Green v. FCC, 447 F.2d 323, 329 (D.C.Cir.1971), and the public interest standard requires licensees to present informational programming responsive to issues important in the licensee's community. Office of Communication of United Church of Christ v. FCC, supra note 10, 707 F.2d at 1426-1432. The large overlap in these two requirements is clear, and is not surprising in light of the fact that the fairness doctrine is a particular manifestation of the public interest standard. See note 11 supra.
 The implications of this overlap are important. In the first place, the fact that the Commission in effect policed the first part of the fairness doctrine through the renewal process further undercuts the majority's argument that ad hoc enforcement of the fairness doctrine permits ad hoc enforcement of programming obligations. As a factual matter, only the second part of the fairness doctrine was policed on a case-by-case basis, and that was necessary given the need for providing swift opportunities to respond to unbalanced presentation of views on pressing issues. In the second place, the Commission's de facto reliance on the programming inquiries of the renewal process generates another reason for prohibiting the Commission from discarding all programming inquiries: the Commission will be unable to ensure that licensees meet their obligations under the first part of the fairness doctrine.
 
 
 [18]
 Ten percent of all licensees, including commercial radio stations, will be subject to the on-site inspections. Decision at 757, JA 23. These inspections are, however, primarily concerned with the technical aspects of broadcasting. They will involve programming only to the extent of checking the licensee's public file to make sure it contains all required programming information. Id. at 751-752, JA 17-18. Thus the other half of the Commission's deterrence mechanism involves a one in ten chance that a licensee will have its public file inspected in any given year